**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| LATANYA MELTON, | CASE NO. 5:21-CV-02193-BYP |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

**INTRODUCTION**

Plaintiff LaTanya Melton filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 18, 2021, pursuant to Local Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated November 18, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** and **REMAND** the Commissioner's decision for further proceedings consistent with this Report and Recommendation.

1

PROCEDURAL BACKGROUND

Ms. Melton filed for DIB and SSI on June 20, 2019, alleging a disability onset date of January 3, 2019. (Tr. 430-38). The claims were denied initially and on reconsideration. (Tr. 287-322; 325-62). She then requested a hearing before an Administrative Law Judge. (Tr. 382-83). Ms. Melton (represented by counsel) and a vocational expert (VE) testified at a hearing before the ALJ on September 3, 2020. (Tr. 243-86). On October 15, 2020, the ALJ issued a written decision finding Ms. Melton not disabled. (Tr. 222-42). The Appeals Council denied Ms. Melton's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Melton timely filed this action on November 17, 2021. (ECF #1).

FACTUAL BACKGROUND

I.   PERSONAL AND VOCATIONAL EVIDENCE

Ms. Melton was 43 years old at the time of her alleged onset date and 44 at the time of the administrative hearing. (Tr. 250). Ms. Melton has an Associate's degree in business administration. (Tr. 252). In the past, Ms. Melton has been employed as a daycare worker, loan processor, nursing assistant, health aide, state tested nurse aide (STNA), scheduler, medical biller, and office manager. (Tr. 252-64).

II.  RELEVANT MEDICAL EVIDENCE[1]

In July 2019, in connection with her social security claims Ms. Melton underwent a psychological consultative exam with Herschel Pickholtz, Ed.D. (Tr. 1464). At the time of her

---

[1]    Ms. Melton challenges the ALJ's assessment of her depression, anxiety, and posttraumatic stress disorder (PTSD), and claims that her mental health impairments alone render her unable to perform substantial gainful employment. (Pl.'s Br., ECF #11, PageID 2244). Ms.

evaluation, Ms. Melton was not married or otherwise attached and lived with her mother and two children, ages five and three. (Tr. 1465). Although her relationship with her mother was strained, her relationships with her children and siblings were good. (*Id.*). She noted that psychiatric problems run in her family. (*Id.*).

Ms. Melton reported doing well in school. (Tr. 1467). While Ms. Melton's relationships with her teachers were "okay," she identified as a loner and did not have much of a relationship with classmates. (*Id.*). Ms. Melton noted that she liked to watch TV and read, socialized with two friends about once a month, and could care for her personal hygiene needs and do light household chores. (Tr. 1470-71).

Dr. Pickholtz noted Ms. Melton appeared to be experiencing moderate impairments due to her depression and moderate to severe levels of anxiety. (Tr. 1468). According to Dr. Pickholtz's report, Ms. Melton had "lost many good jobs due to bipolar issues. She usually didn't receive psychiatric treatment." (*Id.*). Ms. Melton said she last worked in early 2019 but left "due to a lot of physical problems and was having anxiety and depression." However, Dr. Pickholtz noted that with respect to her most recent job, "[u]ntil she left, she did fair at work without psychiatric treatment." (*Id.*).

Dr. Pickholtz found Ms. Melton was compliant during the evaluation but appeared to be experiencing some anxiety. (Tr. 1468). She had appropriate and consistent eye contact, logical

---

Melton's brief asserts that the ALJ's decision is not supported by substantial evidence as it pertains to the opinion of Ms. Melton's treating psychiatric nurse practitioner (PNP), Rachael McLaughlin. The Commissioner noted that "Plaintiff only challenges the ALJ's assessment of her depression, anxiety, and posttraumatic stress disorder (PTSD)" and limited her brief accordingly. (Comm'r's Br., ECF # 13, PageID 2264). Because Ms. Melton's Complaint relates only to an opinion regarding her psychiatric conditions, I have limited my discussion of the medical evidence to that relating to Ms. Melton's mental health.

speech, and normal long-term memory, but a somewhat constricted affect and depressed mood. (Tr. 1468-70). The report notes that Ms. Melton cried on several occasions and smiled twice during the evaluation. (Tr. 1469). Dr. Pickholtz found Ms. Melton was capable of monitoring benefits in an independent fashion should they be granted, but that her overall level of intellectual functioning was in the borderline to low average range. (Tr. 1470).

For his functional assessment, Dr. Pickholtz observed that Ms. Melton had somewhat of an impairment in her ability to understand, remember, and perform simple one- to two-step tasks. (Tr. 1472-73). He said that even with her current medications, she had a significant impairment in responding to supervisors or coworkers in a work setting, and a "very serious impairment at the present time" in her ability to respond to work pressures. (Tr. 1473).

On August 2, 2019, Ms. Melton presented to a social worker at Signature Health Inc. (Tr. 1556 ). Ms. Melton reported having "mental health symptoms since she was a child" but "never received any kind of formal diagnosis or treatment." (Tr. 1557). The intake notes state Ms. Melton came to Signature Health to "get help because she is having interpersonal problems and difficulty maintaining employment due to mental health symptoms." (*Id.*).

Ms. Melton reported experiencing symptoms for over a decade, resulting from a history of trauma. (*Id.*). She reported being repeatedly molested by family members as a child, teased for being biracial, and was largely raised by her grandparents because her mother was an addict. (*Id.*). Her symptoms – including being easily angered, frustrated, argumentative, and overwhelmed; having mood swings and racing thoughts; low mood and energy; and a poor memory for about six months – worsened when her child died unexpectedly in 2012. (*Id.*). Ms. Melton scheduled psychiatric and counseling appointments at Signature Health. (*Id.*).

Two days later, on August 5, 2019, Ms. Melton saw a Signature Health counselor. A mental status exam found she was well-groomed, cooperative, had good eye contact, full range mood, broad affect, and normal speech. (Tr. 1542). Ms. Melton described a tumultuous relationship with the father of her children and said her mother was "extremely negative and invalidating." (Tr. 1545). Ms. Melton "filed for disability for physical health issues" and was sent to a "state doctor" for an evaluation, who had encouraged her to get treatment for her mental health. (*Id.*).

The next day, on August 6, 2019, after reviewing Ms. Melton's records, state agency psychologist Richard Hamersma, Ph.D., issued his administrative findings on Ms. Melton's workplace abilities and limitations. Dr. Hamersma determined that Ms. Melton had no more than moderate limits in each of the Paragraph B criteria. (Tr. 301-02). In particular, he determined she retained the capacity to understand, remember, concentrate, persist, and maintain pace to complete one- to two-step simple routine tasks; interact with coworkers on a brief and superficial basis in a non-public environment; and adapt to a static environment. (Tr. 301-02).

On August 19, 2019, Ms. Melton had another counseling session at Signature Health where she reported having been "an emotional wreck" due to living with her mother who was "very invalidating" and impatient with Ms. Melton's two children. (Tr. 1550). She reported she was "afraid to try to go back to work," felt like she needed medication to "help her calm down," and was glad her psychiatric appointment was "soon." (*Id.*).

On August 26, 2019, Ms. Melton had her first psychiatric appointment at Signature Health, with PNP Rachael McLaughlin, a Board Certified Psychiatric Mental Health Nurse Practitioner. A mental status exam found Ms. Melton to be friendly and pleasant with adequate attention and concentration, consistent eye contact, good hygiene, normal speech and thoughts,

intact memory, mild anxiety, a depressed mood, fair judgment, and poor coping skills. (Tr. 1534-35). Ms. Melton reported feeling depressed some days, but also said that she was occasionally able to enjoy things. (Tr. 1538). Ms. Melton said she was easily irritated and agitated and PNP McLaughlin noted she was "very defensive." (*Id.*). Ms. Melton reported symptoms of panic about every other day that lasted for up to 20 minutes. (*Id.*). She reported episodes of staying up all night, up to two days in a row, in which she "hears people calling her name or sees shadows sometimes, like ghosts." (*Id.*). Ms. Melton reported thoughts of suicide a few months prior, but thoughts of her children prevent her from coming up with plans. (*Id.*). PNP McLaughlin diagnosed her with bipolar II disorder, PTSD, and panic disorder, and prescribed a mood stabilizer. (Tr. 1539).

At a follow-up with PNP McLaughlin on September 9, 2019, Ms. Melton's mental status exam was unchanged. (Tr. 1561-61). Ms. Melton reported concerns that her new medication was "not strong enough," and PNP McLaughlin prescribed a medication to use as needed for anxiety. (Tr. 1564).

On September 26, 2019, Ms. Melton saw PNP McLaughlin. Ms. Melton reported she had a panic attack recently while accompanying her brother to court and seeing him in chains. (Tr. 1570). She also said she recently fought with the father of her children after he failed to pick their daughter up as agreed and "blocked his number for now," noting that she did not want him around the children at that time. (*Id.*). She noted that "she felt like she would've snapped physically if he were around." (*Id.*). Ms. Melton said the anti-anxiety medication was helpful. (*Id.*). PNP McLaughlin increased the dose of Ms. Melton's mood stabilizer and encouraged her to pursue individual counseling. (*Id.*).

On October 23, 2019, Ms. Melton followed-up with PNP McLaughlin. Her mental status exam was unchanged except she was noted to have an appropriate, euthymic mood. (Tr. 1573-74). Ms. Melton reported she was "trying so hard not to have mood swings," but that they are uncontrollable and that she snaps verbally at everyone, including her children, "even if they don't deserve it." (Tr. 1576).  She reported sleeping poorly, between only 4-5 hours per night. (*Id.*).  She reported having a panic attack at the grocery store, causing her to leave all her groceries in her cart and leave. (*Id.*). Ms. Melton also reported feeling claustrophobic while driving on the freeway and having to return home. (*Id.*) PNP McLaughlin increased the dose of her mood stabilizer. (*Id.*).

Ms. Melton had several individual counseling sessions with a Signature Health counselor the following month, November 2019. Mental status exams were normal, except one notation of an angry mood, which the counselor noted was due to an exchange of text messages with the father of her children that had upset her. (Tr. 1552, 2105, 2108). In response to Ms. Melton reportedly being "overwhelmed with emotional dysregulation," her counselor suggested that group therapy could help; Ms. Melton rejected the idea because "she doesn't want to be around people." (Tr. 1555). Ms. Melton was noted to respond positively to the support and feedback provided by the counselor. (Tr. 2108). The record does not indicate Ms. Melton had any additional counseling sessions with Signature Health after the November 25, 2019 appointment.

On February 18, 2020, Ms. Melton had another appointment with PNP McLaughlin. A mental status exam was normal, except for findings that Ms. Melton had an irritable mood, mild anxiety, fair judgment, and poor coping skills. (Tr. 2111-12). Ms. Melton reported her moods were not balanced and she was thinking about her history of trauma, including the passing of her son. (Tr. 2114). She had nightmares about a man grabbing her out of bed and other touch-induced

7

panic resulting from her history of molestation. (*Id.*). PNP McLaughlin noted Ms. Melton had not improved on the higher dose of her mood stabilizer, so it was decreased to the prior dose and a new medication to treat manic episodes was added. (*Id.*).

Ms. Melton continued to see PNP McLaughlin about every month or two through the spring and summer of 2020, either via telephone or videoconference due to the COVID-19 pandemic. (Tr. 2121, 2128, 2135, 2142). Mental status exams during that time were consistently normal, except for notations that Ms. Melton was irritable, had mild anxiety, fair judgment, and poor coping. (Tr. 2118-19, 2125-26, 2132-33, 2139-40). She reported crying spells, physical tiredness, and being overwhelmed constantly, but "constantly pushing herself to be stable for her children." (Tr. 2135). During this period, PNP McLaughlin adjusted Ms. Melton's medications and Ms. Melton reported that a new anti-anxiety medication was working better, but that she was "still very anxious in public." (Tr. 2135).

On September 2, 2020, after about a year of treating Ms. Melton, PNP McLaughlin completed a checkbox medical source statement form, which is the opinion at issue for this Court's review. (Tr. 2204-05). PNP McLaughlin reported she did not believe Ms. Melton could work full time due to "client's hospitalizations for medical issues, unstable medical issues, mental health decline/instability." (Tr. 2204). She reported that Ms. Melton could not sustain any level of mental work, would not be able to maintain attention and concentration in two-hour intervals in a workplace setting, and would require breaks more frequently than every two hours in the course of an eight-hour workday due to her mental health. (*Id.*). PNP McLaughlin reported that Ms. Melton would be off task more than 20% of the time, could not tolerate any work stress, and could never interact with supervisors, coworkers, or the public. (Tr. 2204-05). PNP McLaughlin reported that Ms. Melton could not reliably attend work five days a week on an ongoing basis and would be absent and/or leave early from work at least four

times a month or more due to mental health issues. (Tr. 2205). Finally, PNP McLaughlin found various functional limitations, including a mild limitation in the ability to understand, remember, or apply information; an extreme limitation in the ability to interact with others; a marked limitation in the ability to concentrate, persist, or maintain pace, and a moderate limitation in the ability to adapt or manage oneself. (*Id.*).

## III.   ADMINISTRATIVE HEARING

At the hearing before the ALJ, Ms. Melton testified that while she used to live with her mother, as of January 2020, she now lives in low-income housing in a one-level townhouse with her two children, ages six and four. (Tr. 250-51). Her mother comes over to assist her every Thursday through Sunday, and her aunt comes Monday through Thursday. (Tr. 250). She drives when she feels well enough to, but otherwise relies on her mother and aunt to drive her. (*Id.*). Ms. Melton testified she does not have a lot of friends and does not really trust people. (Tr. 278).

She lies down three to four times per day as a result of pain and/or exhaustion from medication. (Tr. 271). She is unable to bathe her children or do her children's hair, and her family members assist with cooking, cleaning, washing clothes, and other household tasks because she quickly becomes short of breath. (Tr. 268, 271-72).

Ms. Melton testified she gets bad anxiety when she is around a lot of people. (Tr. 274). She also suffers from depression and takes Xanax and Prozac before leaving the house. (*Id.*). Even with medication, she can only go out in public three or four days a month. (*Id.*). Ms. Melton suffers from panic attacks around four times a week and gets sweaty, nauseous, and clammy, with heart palpitations and indications that she will faint. (Tr. 274-276). It typically takes 30 minutes to recover and return to what she was doing after a panic attack. (Tr. 274).

Ms. Melton testified she has problems with her memory and lashing out at others. (Tr. 276-77). She stated that she feels people are against her or come at her, causing her to be "always on the defense because of things that [she has] been through[.]" (Tr. 278).

VE Darin Wright then testified. The ALJ asked if an individual of Ms. Melton's age, education, and work history could perform past relevant work if subject to the following limitations:

- can perform light work and can never climb ladders, ropes and scaffolds;

- should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving;

- can perform simple routine tasks in an environment free of fast-paced production requirements or strict production quotas and that is relatively static with infrequent changes;

- can have occasional superficial interaction with others (meaning that she should not be required to perform work tasks that involve arbitration, confrontation, negotiation, directing the work of others, or being responsible for the safety or welfare of others); and

- should work in a non-public setting.

(Tr. 282). The VE testified that such an individual could not perform Ms. Melton's past relevant work. (*Id.*). He identified other positions such an individual could perform, including marker, garment sorter, and classifier, all light exertion positions. (Tr. 283).

The VE also testified that an employer will tolerate an off-task rate of no greater than 10%. (Tr. 284). In terms of absenteeism, the VE testified that employers will tolerate one day per month, and anything above one day per month on an ongoing and continuous basis would preclude work. (*Id.*).

IV.    MEDICAL OPINIONS

State agency medical consultants reviewed Ms. Melton's record at the initial and reconsideration levels.

On December 24, 2019, state agency psychologist Aracelis Rivera, Psy.D., issued administrative findings on Ms. Melton's workplace abilities and limitations. In particular, the administrative findings indicate that Ms. Melton was moderately limited in her ability to understand and remember detailed instructions; retained the capacity to understand, remember, and follow one-to two-step simple routine tasks; able to interact with coworkers on a brief and superficial basis in a non-public environment; and able to adapt to a static environment. (Tr. 339-40).

On August 6, 2019, Richard J. Hamersma, Ph.D., completed a mental residual functional capacity assessment. (Tr. 318-20). Dr. Hamersma assessed moderate limitations in Ms. Melton's ability to understand and remember detailed instructions, but noted she retained the capacity to understand, remember, and follow one- to two-step simple, routine tasks. (Tr. 318). Additionally, Dr. Hamersma documented moderate limitations in Ms. Melton's abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or in proximity to others without being distracted by them. (Tr. 319). Dr. Hamersma found Ms. Melton to be moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but again explained that she retained the capacity to maintain attention, concentration, persistence, and pace with one- to two-step simple, routine tasks. (*Id.*). In terms of social interaction limitations,

Ms. Melton was moderately limited in her abilities to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 319-20). However, Dr. Hamersma emphasized that Ms. Melton "retains the capacity to interact with her coworkers on a brief and superficial basis in a non-public environment." (Tr. 320). While Ms. Melton was moderately limited in her ability to respond appropriately to changes in the work setting, Dr. Hamersma found that she retained the capacity to adapt to a static environment. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated October 15, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant engaged in substantial gainful activity during the following periods: 2019 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: insulin-dependent diabetes mellitus on insulin pump, hypertension, coronary artery disease s/p NSTEMI with PCI X2, migraine, pancreatitis, obesity, peripheral neuropathy, depression, anxiety, PTSD (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladders, ropes and scaffolds. She should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving. The individual can perform simple routine tasks in an environment free of fast-paced production requirements or strict production quotas and that is relatively static with infrequent changes. She can have occasional superficial interaction with others, superficial meaning that she and[sic] should not be required to perform work tasks that involve arbitration, confrontation, negotiation, directing the work of others or being responsible for the safety or welfare of others. She should work in a nonpublic setting.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on October 10, 1975 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(Tr. 228-36).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is

more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

14

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in

15

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Melton argues the ALJ erred in not finding the opinion of Ms. Melton's treating source, PNP McLaughlin, persuasive. (Pl.'s Br., ECF #11, PageID 2247). She contends the ALJ failed to apply the proper legal standards or reach a decision supported by substantial evidence in evaluating PNP McLaughlin's opinion. (*Id.*).

This matter was considered under the regulations at 20 C.F.R. §§ 404.1520c and 416.920c that apply to applications filed after March 27, 2017. Instead of the former analytical path setting forth a rebuttable presumption of weight accorded to treating sources, referred to as the "treating physician rule," the new regulation provides that ALJ's "will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation[s]." 20 C.F.R. §§ 404.1520c(a) and 416.920c(a); *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (citing *Gower v. Saul*, No. 4:19-CV-00058-HBB, 2020 WL 1151069, at *4 (W.D. Ky. Mar. 9, 2020)). The five factors are (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding, including

but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(c)(1)-(5) and 416.920(c)(1)-(5). Of these five factors, "the two most important are supportability and consistency." *Gower*, 2020 WL 1151069, at *4 (citing 20 C.F.R. §§ 404.1520c(a) and (b)(2)); 20 C.F.R. § 416.920c(b)(2). The new regulatory scheme requires that an ALJ "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).

While these regulations demand less of an ALJ than the former rules governing the evaluation of medical opinions, they "still require the ALJ to provide a coherent explanation for [her] reasoning." *Lester v. Saul*, No. 20-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). Ultimately, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found them. *Holston v. Saul,* No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supporting the conclusion with substantial evidence. *Id.* at *14.

In her decision, the ALJ's discussion of PNP McLaughlin's opinion is brief:

[a] counselor indicates that she cannot do any work and would require up to six additional breaks, would be off task more than 20%, cannot tolerate work stress, can never have any interaction with others, and would be absent 4 days a month. I do not find this to be persuasive as it is clearly overstated as it is inconsistent with the treatment records and her ADLs as discussed above.

17

(Tr. 235).[2] The issue for determination is whether the ALJ employed the proper legal standard by considering the factors and supporting her conclusion with substantial evidence. In finding PNP McLaughlin's opinion unpersuasive, the ALJ must provide coherent explanation for her reasoning. *Lester*, 2020 WL 8093313, at *14. Here, I conclude the ALJ failed to provide such a coherent explanation, and thus this matter must be remanded.

In finding PNP McLaughlin's opinion was unpersuasive, the ALJ reasoned that the opinion was overstated because it was inconsistent with other evidence, specifically including Ms. Melton's treatment records and her activities of daily life. (Tr. 235). The ALJ's analysis and summarization of Ms. Melton's treatment records included evidence both consistent with and inconsistent with PNP McLaughlin's opinion. For example, the ALJ noted Ms. Melton was often well-groomed, cooperative, and pleasant during her mental health treatment sessions and maintained good eye contact (Tr. 234); however, the ALJ also noted Ms. Melton's multiple reports of difficulty keeping jobs due to emotional instability (Tr. 233-34), multiple reports of anxiousness and panic in public settings, despite medication changes (Tr. 233-34), and mental status exams showing anxiety during mental health treatment sessions. (Tr. 234). Because the ALJ's summary of evidence includes both supportive and contradictory information, it does little to explain the ALJ's

---

[2]       Ms. Melton noted in her brief that the ALJ incorrectly identified PNP McLaughlin as a "counselor" when she is in fact a psychiatric nurse practitioner. (Pl.'s Br., ECF # 11, PageID # 2249). The Commissioner countered that this mistake provides no basis for remand because the ALJ "never stated PNP McLaughlin was not an acceptable medical source and did not reject her opinions on that basis." (Comm'r's Br., ECF # 13, PageID # 2275, fn. 4., citing Tr. 235). I agree with the Commissioner. While the ALJ did refer to PNP McLaughlin as a counselor, the ALJ evaluated the opinion for its persuasiveness, which confirms the ALJ considered PNP McLaughlin to be an acceptable medical source.

reasoning or to provide sufficient rationale for the reviewing court. *See Hardy v. Comm'r of Soc. Sec,* No. 20-10918, 554 F. Supp. 3d 900, 907 (E.D. Mich. Aug. 13, 2021)

Similarly, Ms. Melton's activities of daily life were both consistent and inconsistent with PNP McLaughlin's opinion. The ALJ noted that Ms. Melton reported independence in personal care; she vacuums once a week, mops twice a week and sweeps her floors daily; she does laundry, irons, and shops for food; she cares for her children and checks their homework; socializes with two friends once per month; and enjoys watching television. (Tr. 233-34).

By contrast, and not mentioned by the ALJ, Ms. Melton also reported being unable to do her children's hair, requiring help in washing clothing, and needing assistance from her mother or her aunt around the house "every other day." (Tr. 304-05). Even with medication to handle her anxiety and depression, she reported only being able to leave the house three to four days a month. (Tr. 274). Ms. Melton reported needing another person to go with her to the grocery store due to her inability to complete shopping by herself without having a panic attack. (*See* Tr. 233-34, 275). In one instance, she reported having such a severe panic attack that she "left all her groceries in the cart and left" the store. (Tr. 1576). The ALJ may have found this evidence unpersuasive, however, she failed to explain why.

There is no regulatory requirement that the ALJ deem any opinion of record "persuasive"; however, the regulations do require that the ALJ clearly explain her consideration of the opinions and identify the evidence supporting her conclusions. *Lester,* 2020 WL 8093313, at *14. Here, the ALJ did not clearly explain her consideration of PNP McLaughlin's opinion nor identify the specific evidence supporting her conclusion that it was overstated and inconsistent with the remainder of Ms. Melton's medical records and activities of daily life—some of which support PNP

McLaughlin's opinion, and some of which seemingly cut against it. Because the ALJ's summary of treatment records and activities of daily life includes both positive and negative findings, it does little to explain the ALJ's reasoning or to provide sufficient rationale for the reviewing court. *See Hardy*, 554 F. Supp. 3d at 907.

Without such explanation, judicial review of whether there is substantial evidence supporting the ALJ's determination in this respect is not possible. This Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. However, "the [c]ourt cannot perform even that limited oversight function in a case such as this, where 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Id.* (citing *Fleischer*, 774 F. Supp. 2d at 877).

Not only is an explanation of the ALJ's reasoning required by 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2) and essential to this Court's review, but it also ensures that claimants like Ms. Melton understand why their application for benefits has been denied or approved:

> faithful adherence to the "articulation" requirement of the new regulations is vital to maintaining the guarantee of the rule of law. As courts have explained, "'[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Hardy*, 554 F. Supp. 3d at 908 (quoting *Wilson*, 378 F.3d at 544 and *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

20

The ALJ must provide an explanation for why she found PNP McLaughlin's opinion unpersuasive. Specifically, the ALJ should provide coherent explanation as to why she found PNP McLaughlin's opinion to be "overstated and inconsistent" with the remainder of the record evidence. The ALJ must explain how she considered the supportability and consistency factors for PNP McLaughlin's opinion in her determination and decision. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).  That reasoning must be discussed with sufficient particularity for a reviewing court to determine whether, on the whole, substantial evidence supports the decision.

Remand, on its own, does not guarantee any one particular outcome. Additional review may or may not change the ALJ's decision. It may very well be that upon further review, the ALJ again finds Ms. Melton not disabled. However, Ms. Melton is entitled to the due process afforded to her pursuant to the SSA's regulations, namely, a decision that adequately explains the reasoning behind it. Recognizing substantial evidence as a defense to non-compliance with those regulations "would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." *Hardy*, 554 F. Supp. 3d at 908 (quoting *Wilson*, 378 F.3d at 546).

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** and **REMAND** the Commissioner's decision denying disability insurance benefits and supplemental security income for further proceedings consistent with this Report and Recommendation.

Dated: October 13, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).